607 F.2d 44
 26 Cont.Cas.Fed. (CCH) 83,718
 UNITED STATES ex relatione for the use of K & M CORP., a New
Jersey corporation, Appellant,
v.
A & M GREGOS, INC., a corporation of the State of New
Jersey, New Hampshire Insurance Co., a corporation of the
State of New Hampshire, and F & Y Mechanical Contractors,
Inc., a corporation of the State of New Jersey, Appellees,
v.
EASTERN MECHANICAL CO-OP, INC., a corporation of the State
of New Jersey, Eastern Air Conditioning and
Refrigeration Corp., a corporation of
the State of New Jersey, and
Kenneth Klein, Appellees.
 No. 79-1068.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 4, 1979.
Decided Oct. 4, 1979.
 
 Richard R. Width, John H. Schmidt, Jr. (argued), Lindabury, McCormick & Estabrook, Westfield, N. J., for appellant.
 Martin J. Arbus (argued), Giordano, Halleran & Crahy, Middletown, N. J., for respondent A & M Gregos, Inc.
 Before SEITZ, Chief Judge, GIBBONS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 Appellant K & M Corporation, a subcontractor on a government construction contract, seeks to enforce a claim against the payment bond executed by the project's prime contractor. The district court granted summary judgment for appellees, concluding that K & M was too remotely related to the prime contractor to be protected by the statutory bond.
 
 
 2
 The United States Postal Service awarded A & M Gregos, Inc., a contract to perform certain construction work on the main post office building at Elizabeth, New Jersey. Pursuant to the requirements of the Miller Act, 40 U.S.C. § 270a (1976), Gregos executed bonds to secure payment and performance, with New Hampshire Insurance Co. as surety.
 
 
 3
 This suit concerns subcontracts executed by Gregos with Eastern Air Conditioning and Refrigeration Corp. ("Eastern ACR") and Eastern Mechanical Co-op, Inc. ("Eastern Mechanical"), two companies operating from a single location and under the principal control of Kenneth Klein. On July 9, 1975, Gregos awarded Eastern ACR a subcontract for the plumbing and drainage requirements of the project. Sometime prior to November 24, 1975, Eastern ACR further subcontracted all of this work to F & Y Mechanical Contractors, Inc. On November 24, 1975, Gregos awarded Eastern Mechanical a subcontract for heating, ventilation, and air conditioning work. Eastern Mechanical took the heating, ventilation, and air conditioning subcontract on the express condition that it would, within 48 hours, further subcontract all of the required work to F & Y Plumbing, Inc. In compliance with this provision, Eastern Mechanical executed a contract on November 24, 1975, with F & Y Mechanical, which we are told is the same company as F & Y Plumbing, Inc. The reason for this indirect method of bringing F & Y Mechanical in as a subcontractor, according to the deposition of George Liadis, the president of Gregos, was that Gregos became aware of F & Y's suitability through Eastern Mechanical and believed that to contract directly with F & Y Mechanical would, in this situation, be an improper interference with Eastern Mechanical's business relationship with F & Y Mechanical.
 
 
 4
 On June 14, 1976, F & Y Mechanical contracted with appellant K & M for the insulation requirements of these two subcontracts. At this time, officers of K & M were unaware of the role played by the Eastern companies in this arrangement and believed that F & Y Mechanical had a direct contractual relationship with Gregos. The affidavit of William Kretzmer, president of K & M, states that this misunderstanding resulted from the absence of any labor or supplies from the Eastern companies at the work site. The record contains no evidence of any person misrepresenting facts to K & M.
 
 
 5
 Appellant K & M performed insulation work from June 26, 1976, to December 8, 1976. It refused to resume work in January 1977 because F & Y Mechanical had failed to pay for any of the work already completed. During the course of its efforts to collect, K & M first learned that the Eastern companies, and not F & Y Mechanical, had direct subcontracts with Gregos.
 
 
 6
 When it failed to obtain full payment, K & M filed this action under the Miller Act, 40 U.S.C. § 270b (1976), against Gregos, New Hampshire Insurance Co., and F & Y Mechanical[1], asserting a right to enforce its claim against the payment bond. The district court granted defendants-appellees' motion for summary judgment and issued an order dismissing K & M's claim and all pendent claims. This court has jurisdiction to hear the appeal under 28 U.S.C. § 1291 (1976).
 
 
 7
 On any construction contract with the United States exceeding $25,000 in amount, the Miller Act requires the prime contractor to execute a bond "for the protection of all persons supplying labor and materials." 40 U.S.C. § 270a(a)(2) (1976). Any protected supplier of materials or labor may sue on the bond for amounts due him. Id. § 270b(a). But the Act imposes limitations on this right. A person "having a direct contractual relationship with a subcontractor" but no privity of contract with the prime contractor may sue only if he gives the prime contractor notice of his claim within ninety days of the completion of his work. Id.
 
 
 8
 The Supreme Court, and prior to its decision a majority of the federal circuits, read this last provision as limiting the right to sue on a payment bond to persons with a direct contractual relationship with either the prime contractor or a subcontractor, and it read the term "subcontractor" as meaning first-tier subcontractor. J. W. Bateson Co. v. United States ex rel. Board of the Trustees of National Automatic Sprinkler Industry Pension Fund, 434 U.S. 586, 98 S.Ct. 873, 55 L.Ed.2d 50 (1978). See also In re Garden State Erectors, Inc. v. A. Leo Nash Steel Corp., 599 F.2d 1279 (3d Cir. 1979). Because K & M's only contract is with F & Y Mechanical, a second-tier subcontractor, the rule of the Bateson case would seem to deny the right to sue on the bond.
 
 
 9
 Appellant argues that the position of the Eastern companies should be ignored and that F & Y Mechanical should be deemed a first-tier subcontractor. Appellant asserts that the Eastern companies are not subcontractors within the meaning of that term under the Miller Act because they provided neither labor nor materials and that F & Y Mechanical actually carried out the function of the first-tier subcontractor. They argue that unless we give the term "subcontractor" this functional definition, a prime contractor and his surety would be free to set up sham subcontractors for the purpose of limiting their liability on a payment bond. The district court rejected appellant's argument because it read Bateson to preclude such an examination and found that the bona fide nature of the contracts between Gregos and the Eastern companies could not be disputed.
 
 
 10
 We agree that Bateson rules out a holding that the court may look to the functions carried out by contracting parties, rather than to the position they occupy in the contractual structure, to identify the first-tier subcontractor. In Bateson, the court of appeals had ruled that a certain company, formally a second-tier subcontractor, should be deemed a first-tier subcontractor on the basis of its close and substantial working relationship with the prime contractor. The Supreme Court found this reasoning inconsistent with the language and legislative history of the Miller Act. 434 U.S. at 593-94, 98 S.Ct. 873. The clear import of Bateson Is that Congress imposed a structurally defined limitation on the right to sue on a payment bond, which was not to be overstepped by a functional examination of the relationships of the contracting parties.
 
 
 11
 Appellant's brief cites cases in which a court has distinguished between a subcontractor and a materialman on the basis of the substantiality of a company's relationship with the prime contractor. For example, in F. D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 121-24, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), the Court held that a company which had contracted not only to supply the plywood required for a defense housing contract but also to select, modify, detail, and install all custom millwork was a subcontractor. However, neither this case nor any other case that applies this analysis is authority for expanding the meaning of "subcontractor" to cover companies that do not have the requisite contractual relationship. The company in F. D. Rich, as in all of these cases, had a direct contractual relationship with the prime contractor. Moreover, the consequence of classifying a company as a materialman is to deny to its suppliers of materials and services the right to bring suit on the payment bond. It is not to treat some company further down the contractual chain as a subcontractor. See Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co., 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163 (1944).
 
 
 12
 We also find unpersuasive appellant's argument that a functional approach is necessary to prevent the establishment of sham subcontractors. This concern led the Tenth Circuit to look past formal contractual arrangements in Glens Falls Insurance Co. v. Newton Lumber & Manufacturing Co., 388 F.2d 66 (10th Cir. 1967), Cert. denied, 390 U.S. 905, 88 S.Ct. 821, 19 L.Ed.2d 873 (1968). The prime contractor on a defense housing project, DMH Enterprises, Inc., had fully negotiated a subcontract with Whiteside Construction Co. for carpentry and millwork but had arranged the contract so that Whiteside was only a second-tier subcontractor. The first-tier subcontractor, Earl M. Campbell, was a close friend and relative of the president of DMH. In a suit by suppliers of Whiteside to enforce claims against the payment bond, the court upheld a determination that the contract between DMH and Campbell was a sham and that Whiteside was the true subcontractor. The court took into consideration not only the fact that Campbell provided no materials or labor of his own but also that DMH had no intention of imposing any real contractual obligations on Campbell and that the true purpose of the arrangement was to insulate DMH from liability under the Miller Act.
 
 
 13
 A similar case is Continental Casualty Co. v. United States ex rel. Conroe Creosoting Co., 308 F.2d 846 (5th Cir. 1963), in which the prime contractor set up a subsidiary as the first-tier subcontractor for the apparent purpose of limiting liability under the Miller Act. The court applied the corporate alter ego doctrine to treat the parent and subsidiary as one corporation.
 
 
 14
 In the present case, we do not face the situation of an actual sham. The contracts that Gregos executed with the Eastern companies held them legally accountable for the satisfactory performance of the contract work. There is no evidence of familial ties or of any other facts suggesting that Gregos has not considered these provisions to be serious and enforceable obligations. On the contrary, subsequent events, documented in the record, corroborate this intention. After a series of disputes between the officers of Gregos and Kenneth Klein, Gregos informed Klein that it was holding the Eastern companies in default of performance and responsible for the cost of substitute performance. As a third-party complainant in this suit, Gregos charged the Eastern companies with breach of these contracts.
 
 
 15
 The record also lacks any evidence that Gregos made these arrangements with the purpose of limiting its liability on the payment bond. The only evidence of Gregos's purpose is the testimony of its president that it wished to take advantage of the contracts that the Eastern companies had with subcontractors and that it did not wish to interfere with the business relationships that the Eastern companies had with F & Y Mechanical. Appellant does not dispute these facts. We are compelled, therefore, to agree with the district court that Gregos executed bona fide contracts with the Eastern companies.
 
 
 16
 The facts of the present case illustrate that an arrangement whereby a subcontractor provides no labor or materials of its own is not necessarily inconsistent with a bona fide contractual arrangement. Appellant would have us adopt an overly broad prophylactic rule. We do not believe that the difficulty or importance of preventing prime contractors and their sureties from circumventing liability under the Miller Act is so great that such a rule is justified. Given this disposition of the case, we do not decide whether Bateson ever permits an application of a sham rule or whether in the case of a truly illusory subcontractor this circuit should apply a sham rule. We merely decline to apply such a rule in this case.
 
 
 17
 Finally, appellant argues that Gregos is estopped to deny that F & Y Mechanical was its first-tier subcontractor. K & M claims that as a result of the manner in which Gregos set up its subcontracts, it was unaware of the involvement of the Eastern companies. The party asserting estoppel must show more than that he was ignorant about some matter. Among the more important requirements of estoppel are that the party to be estopped has misrepresented or wrongfully concealed some material fact and that this party acted with the intention that the asserting party rely to his detriment on his misunderstanding. United States v. Ruby Co., 588 F.2d 697, 703 (9th Cir. 1978); Russell Corp. v. United States, 537 F.2d 474, 484, 210 Ct.Cl. 596 (Ct.Cl.1976); United States ex rel. J. W. Smith & Co. v. Aetna Casualty & Surety Co., 480 F.2d 1095, 1099 (8th Cir. 1973). We see nothing in the record that suggests that either Gregos or anyone else either misrepresented or wrongfully concealed facts.[2] Nor is there any evidence suggesting that Gregos intended that K & M or anyone else act in reliance on the belief that F & Y Mechanical was the first-tier subcontractor. Thus, there are no genuine issues of material fact that raise a triable issue of equitable estoppel.
 
 
 18
 The judgment of the district court will be affirmed.
 
 
 
 [1]
 F & Y Mechanical never was served and never has made an appearance
 
 
 [2]
 Appellant's brief states that officers of Gregos referred to Kenneth Klein as a vice-president of Gregos. However, the source for this assertion does not support it. The president of K & M, William Kretzmer, stated in his affidavit:
 I was under the distinct impression that Mr. Klein was a vice-president of A & M Gregos, Inc. That belief resulted from numerous conversations I had with various individuals at A & M Gregos, Inc., and F & Y Mechanical.
 Standing alone, this statement does not permit an inference that any misrepresentation or wrongful concealment of fact occurred.